[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11621

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOHN GLADDEN,
JESSICA LINTON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 6:19-cr-00219-LSC-SGC-7

_____

21-11621                Opinion of the Court                2

Before WILSON, JILL PRYOR, Circuit Judges, and COVINGTON,[*] District Judge.

COVINGTON, District Judge:

Jessica Linton and John Gladden were convicted of conspiracy to commit health care fraud and mail fraud, and the substantive offenses of health care fraud, mail fraud, and aggravated identity theft, for their roles in a multi-year scheme to defraud insurance companies. Linton, Gladden, and several others at Global Compounding Pharmacy received inflated reimbursement payments by billing for medically unnecessary and fraudulent prescriptions. Linton and Gladden now appeal their convictions. In addition, Gladden appeals the district court's restitution and forfeiture orders. For the following reasons, we affirm as to Linton and affirm in part, vacate in part, and remand as to Gladden.

I

Global Compounding Pharmacy began operations in 2014. In its first two years of existence, Global billed approximately $193 million to pharmacy benefit managers (PBMs) and received over $49 million in reimbursement payments from PBMs and insurance companies.

As it turns out, Global's success was attributable to a company-wide scheme to defraud pharmacy networks by secretly

---

[*] Honorable Virginia M. Covington, United States District Judge for the Middle District of Florida, sitting by designation.

billing PBMs for medically unnecessary and fraudulent prescriptions.

When it began operations, Global focused on filling prescriptions for compounded drugs, which are supposed to be personalized medications for patients with individual needs. The reimbursement rates for these drugs are very high: Global could be reimbursed as much as $20,000 for a single tube of a compounded cream. Global employees thus saw an opportunity to generate significant revenue by dispensing more compounded drugs. Whether the patients actually had a medical need for these drugs was of little concern.

The underlying conspiracy at Global, which is not in dispute, relied on the following methods: adding non-prescribed items to prescription forms; incentivizing or paying prescribers to write medically unnecessary prescriptions; directing employees to obtain high-reimbursement, medically unnecessary prescriptions; billing for unauthorized or forged prescriptions; altering prescriptions to increase revenue; automatically refilling medications; inflating the average wholesale price of ingredients for compounded drugs; hiring sales representatives who were close to prescribers; adding or removing ingredients from compounded drugs to increase profits; reducing co-pays to induce beneficiaries to obtain medically unnecessary prescriptions; and providing false information to PBMs during audits.

A PBM is a company that acts as an intermediary between pharmacies and insurance companies. Typically, an insurance

company beneficiary visits his or her doctor, the doctor prescribes the beneficiary a prescription drug, and then the beneficiary visits a pharmacy to fill the prescription. Once the patient brings the prescription to a pharmacy, the pharmacy inputs the information into the pharmacy processing system, which communicates with the PBM. The PBM checks whether the drug is covered and determines the beneficiary's co-pay. The PBM shares this information with the pharmacy, so that the pharmacy can collect the co-pay and dispense the drug.

### A.        Jessica Linton's Role

As the manager of the billing department at the Clearwater Call Center, Jessica Linton played an integral role in the scheme at Global.

First, Linton and other billers at the Clearwater Call Center would run "dummy claims" to identify products covered by insurance. The billing department would submit test claims for prescriptions to an insurance company to see whether the company would reimburse the product, and then claw back the claim. Linton would proceed to solicit Global employees to obtain prescriptions for the most lucrative products.

Second, Linton used Global's preprinted prescription forms to add and change prescriptions without the approval of the prescribing doctors. For example, on January 6, 2015, Global sales representative Joshlyn Bowen emailed Linton about a prescription for her husband, Robert Cody Bowen. Dr. John Almirol, who treated Robert Bowen as a patient, issued the prescription. In

response to Joshlyn Bowen's email, Linton stated that she received the prescription, and confirmed, "[j]ust pain and migraine cream is all he needs?" Joshlyn Bowen then asked Linton to add additional medication to the prescriptions—without consulting Dr. Almirol. Linton did just that.

Third, Linton directed employees to obtain prescriptions for products that the patients would not—or should not—use. For example, Jamey Mays, Global's lead pharmacist, testified that he and Linton emailed about a scar patch for which he had received a prescription. In an email to Linton regarding whether to reverse the prescription, Mays wrote "you can leave it. It is working really well," followed by a winking smiley face. In fact, Mays had never received the product. Nor could he have, because as Linton was well aware, the product had been discontinued.

This was not the only time Linton authorized the filling of prescriptions for products that would never be used. In June 2015, Linton sent a text message to Angie Nelson, a Global district manager, about a skin treatment medication called SilaPak that had been prescribed to Nelson's child. Linton's text message read "hey girl, Jamey [Mays] is not comfortable with [patients] under 6 using SilaPak. He said he'd let [Nelson's daughter's] order ship as long as you don't actually use it on her."

As mentioned before, automatic refills were part of Global's scheme. But eventually, some patients began to take issue with the surplus of products they were receiving through automatic refills. Linton had a solution: reroute the medications of dissatisfied

customers to the address of Jeremy Adams, Global's owner. That way, Global could continue to bill insurance for the refilled prescriptions that were no longer wanted by the actual patients.

Donald Edenfield, the former husband of Lori Dawn Edenfield, a nurse practitioner relied upon by Global, testified that he had received several refills of compounded creams from Global, even though he did not need them, had not requested the refills, and did not submit co-pays for the refills. Donald Edenfield contacted Lori Dawn Edenfield to request that Global stop sending him the creams. This seemed to work: Donald Edenfield no longer received the creams at his address. However, Global subsequently issued a prescription in Donald Edenfield's name for the compounded creams, but with the shipping address on the prescription labels listed as Jeremy Adams' address. Of course, Donald Edenfield did not live with Jeremy Adams.

The same practice was applied to Donald Edenfield's mother, Doris Edenfield. The edit log for Doris Edenfield's patient file reflected that her address on file had been changed to that of Jeremy Adams and that prescriptions in her name had been shipped to that address.

Derrick Wester, who was also formerly married to Lori Dawn Edenfield, testified that he too received unwanted refills of medication. Wester called Global to ask that it stop sending him refills. Global complied, but it continued to issue prescriptions in Wester's name, sending the refills to Adams's address.

The government's evidence reflects that Linton changed the addresses on file for the Edenfields and Wester, permitting Global to continue billing insurance for prescriptions that the Edenfields and Wester neither wanted nor knew about.

### B.        John Gladden's Role

John Gladden was not employed at Global for long before he began to notice certain oddities. Shortly after he joined Global in 2015 as the district manager for Georgia, Gladden saw "some red flags." Those red flags involved his subordinates' obtaining a significant number of prescriptions for themselves. Specifically, after viewing a subordinate's commission report in February 2015, Gladden sent a series of emails to his supervisor, Phillip Marks. In one email, Gladden wrote "AMAZING . . . of the 27 scripts, only 2 are for [] real patients . . . the other 25 appear to be for [the employee]." He then sent another email: "I'm sorry, I had to go back and take a third look in disbelief at his report . . . it was three actual patients not two . . . clearly still an amazing feet [sic]! lol[.]"

Gladden did not resign in response to these red flags. Nor did he report the false prescriptions to his superiors. Instead, he decided that he wanted in on the action. So, Gladden directed his sales representatives to obtain prescriptions for themselves for products with high reimbursement rates, like SilaPak. On July 9, 2015, Gladden sent his sales team an email with the subject line "Get your personal scripts," proclaiming that "everyone should have a personal script for yourself, spouse, and family members."

As it turns out, Gladden was not deeply concerned with the health and wellbeing of his employees and their family members. One of Gladden's sales representatives, Dawn Whitten, responded to Gladden's email, stating that she did not "want to draw a red flag to the MD or to me and my family." She noted that none of her family members "have any documentation in our medical chart that would require a Rx for pain." This was not an issue for Gladden: he responded to Whitten, writing that she should "[a]t least get the SilaPak . . . I would just have ur buddy wright [sic] it for you[.]" The "buddy" was Dr. Steven Leichter, an endocrinologist. Gladden had visited Dr. Leichter's office with Whitten before, so he knew that Dr. Leichter was a diabetes specialist with no reason to prescribe dermatology products.

Whitten ultimately obtained prescriptions for herself and her family members, including her twelve-year-old daughter. Dr. Leichter was listed as the prescribing physician for those prescriptions; however, Whitten testified that Dr. Leichter did not authorize the prescriptions.

Megan Rumble, another sales representative who worked for Gladden, also obtained medically unnecessary prescriptions at his direction. Rumble testified that she did not have any "medical need" for the prescriptions she obtained, but she got them "because [she] was instructed to."

### C.        District Court Proceedings

A grand jury sitting in the Northern District of Alabama returned a 103-count indictment charging Linton, Gladden, and

eight co-defendants for their roles in this scheme. Linton was charged with conspiracy to commit health care fraud and mail fraud, in violation of 18 U.S.C. § 1349 (Count 1), thirteen counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 10–11, 16–19, 23–25, 30–33), three counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 60, 64–65), and seven counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 70–75, 79).

Gladden was charged with conspiracy to commit health care fraud and mail fraud (Count 1), six counts of health care fraud (Counts 34–39), one count of mail fraud (Count 66), and one count of aggravated identity theft (Count 84).

Following a six-day jury trial, Gladden and Linton were convicted on all counts. Linton was sentenced to 132 months' imprisonment, followed by three years of supervised release. Gladden was sentenced to 64 months' imprisonment, followed by one year of supervised release. Linton was ordered to pay restitution in the amount of $39,370,481.41 and forfeiture in the amount of $335,775.93. Gladden was ordered to pay restitution in the amount of $134,772.86 and forfeiture in the amount of $157,587.33.

Specifically, the presentence investigation report (PSR) for Gladden reported the amount of loss attributable to Gladden for his role in the scheme as between $1,500,000 and $3,500,000. To calculate the Guidelines range, the probation officer grouped together the conspiracy and fraud claims, resulting in a base offense level of seven. The probation officer applied a two-level

enhancement for Gladden's role as a manager in the scheme, and another two-level obstruction of justice enhancement. After an additional sixteen-level enhancement to account for Gladden's attributable loss ranging from $1,500,000 to $3,500,000, Gladden's total offense level was 27.

The PSR indicated that restitution would be ordered at sentencing, but that the court could apportion restitution payments based on the victims' losses and Gladden's economic circumstances. The PSR also noted that the government intended to seek an order of forfeiture against Gladden.

Gladden objected to the PSR. He contended that the government failed to provide sufficient documentation or evidence for the loss amount. According to Gladden, the attributable loss amount should not exceed $31,104.

Before sentencing, the government moved for a final order of forfeiture for $167,587.33 against Gladden, which was the amount of his salary during his time at Global. The government sought forfeiture only as to property derived from gross proceeds traceable to the commission of the health care fraud conspiracy charged in count one of the indictment. The government argued that Gladden's salary constituted the proceeds from his role in the fraud conspiracy. According to the government, fraud permeated so many aspects of Global's operations that Global would not have operated in the way that it did or paid Gladden his salary but for the fraudulent conduct.

In response, Gladden argued that the proposed forfeiture order was overly punitive because he was found responsible for only six fraudulent prescriptions at a total cost of $31,104. According to Gladden, the forfeiture amount should be $210.21, which was the total compensation he received for those six fraudulent prescriptions. Gladden also asserted that it was improper to attribute all of his income to his offenses because he was not involved in the overall conspiracy beyond forwarding emails.

At sentencing, the government called investigator Katherine Gerhardt to explain the total loss and restitution calculations. Gerhardt calculated that the entire fraudulent scheme at Global generated $2,118,271.54 in insurance payments, which Gerhardt considered the loss amount. To calculate the loss amount, Gerhardt first isolated the prescriptions for which no co-pay had been collected. Next, for each of those prescriptions, Gerhardt subtracted the co-pay amount from the retail price, the sum of which reflected the amount that insurance paid to Global. To calculate the loss amount attributable to Gladden, Gerhardt applied this methodology to the commission reports of Gladden's subordinates. Based on Gerhardt's methodology, the government proposed $134,772.86 in restitution, which represented the amount insurance paid Global for the fraudulent prescriptions that two of Gladden's subordinates, Whitten and Rumble, obtained for themselves and their family members.

Gladden contended that the restitution calculation should exclude prescriptions that were medically necessary, which, in his view, could be established if a patient ultimately used the prescribed drugs for a medical purpose. According to Gladden, because Whitten and her family used the drugs they received, they should be omitted from the restitution amount. The district court rejected Gladden's argument, disagreeing with the premise that an overprescribed product was medically necessary simply because some of it was used. The district court also found unavailing Gladden's argument that the restitution amount should not include refills, reasoning that Gladden knew his subordinates were ordering the refills.

As for Gladden's forfeiture order, the district court accepted the government's argument that Gladden's full salary should be the forfeiture amount because his salary constituted the gross proceeds traceable to the commission of the health care fraud conspiracy charged in count one of the indictment.

On appeal, Linton challenges only her convictions. Gladden challenges his convictions, as well as the restitution order and forfeiture judgment against him.

## II

When analyzing the sufficiency of the evidence, this Court's review is *de novo*, "viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *United States v. Sosa*, 777 F.3d 1279, 1289 (11th Cir. 2015) (quotations omitted). We "will not

overturn a conviction on the grounds of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004) (internal quotations omitted).

This Court reviews the legal bases for a restitution order *de novo* and factual findings concerning a restitution order for clear error. *United States v. Foley*, 508 F.3d 627, 632 (11th Cir. 2007). Likewise, "[i]n reviewing forfeiture orders, we review findings of fact for clear error and legal conclusions *de novo*." *United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021). The Court will find clear error if, "after reviewing all the evidence, [it is] left with the definite and firm conviction that a mistake has been committed." *United States v. Alicea*, 875 F.3d 606, 608 (11th Cir. 2017) (per curiam) (internal quotations omitted).

### III

#### A.          Jessica Linton's Convictions

Linton argues that, as to all her convictions, the government failed to present sufficient evidence to demonstrate that she possessed the requisite mens rea. We disagree.

Beginning with Linton's conspiracy conviction, the jury reasonably found that Linton knowingly and voluntarily joined the conspiracy at Global based on her conversations with Jamey Mays and Angie Nelson about prescriptions for medically unnecessary products. *See United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015) (stating that to establish conspiracy under 18 U.S.C. § 1349,

"the government must prove that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it."). While Linton contends she was unaware of the conspiracy at Global, her argument is belied by the evidence reflecting her willingness to bill for prescriptions that were never filled or intended to be used. *See id.* (noting that the government may prove the elements of conspiracy by circumstantial evidence). Indeed, Mays told Linton not to reverse a prescription for a discontinued product, even going so far as to joke about how it was working really well—punctuated by a winking smiley face. Linton also told Nelson that Mays would permit her to fill a prescription for Nelson's minor daughter, on the express condition that Nelson's daughter not use the product.

Linton's efforts to conceal aspects of the conspiracy further support her conviction. *See United States v. Reeves*, 742 F.3d 487, 500 (11th Cir. 2014) ("[E]fforts to conceal a conspiracy may support the inference that a defendant knew of the conspiracy and joined it while it was in operation."). On at least one occasion, Linton disciplined an employee who provided truthful information to a pharmacist about Global's billing practices. Specifically, Fermin Alfonso—a biller who reported to Linton at the Clearwater Call Center—testified that he told Global pharmacist Judith Reynolds that several sales representatives were automatically adding certain ingredients to prescriptions in order to receive higher reimbursements. Linton subsequently issued a written warning to Alfonso for "[p]utting in writing a false statement that could result in legal action[.]" In reality, however, Linton displayed little

concern with the substance of Alfonso's allegations. Linton told Alfonso "not to worry about" the reprimand and "not to take it too seriously." Nor did Linton find it necessary to instruct Alfonso to change anything about his billing practices. The written warning, juxtaposed with Linton's verbal indication not to worry about it, supports an inference that the warning was an effort to obscure the nature of the billing practices that Linton condoned.

Linton also instructed her subordinates in an August 12, 2015, email to avoid putting notes in patients' prescription management systems that would reveal that the patient "is paying a certain amount less than what their copay is." Such a discrepancy, as it turns out, could raise red flags in an audit. The jury could thus reasonably infer from Linton's email that she participated in the practice of reducing co-pays and took steps to conceal it.

As to Linton's substantive fraud convictions, she contends that she lacked the specific intent to defraud necessary to support the convictions for health care and mail fraud. We disagree. Linton's conversations with Mays and Nelson are more than sufficient to demonstrate her knowledge that Mays and Nelson were submitting false claims. *See United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007) (stating that to sustain a conviction for health care fraud, the government must prove that the defendant knew that the claims submitted to the health care benefit program were false); *United States v. Wheeler*, 16 F.4th 805, 819 (11th Cir. 2021) (per curiam) ("To prove that a defendant had the intent to defraud, the [g]overnment has to prove that the defendants either

knew they were making false representations or acted with 'reckless indifference to the truth.'"). Indeed, it is difficult to conceive that Linton was unaware of the falsity of the prescriptions in light of her knowledge that Mays was issuing prescriptions with an explicit directive that the patient not use the product.

Linton nevertheless contends that she did not intend to defraud because she lacked experience in the compounding industry. This argument is unpersuasive. Linton's conversations with Mays and Nelson would give pause to even a novice in the industry. Furthermore, Linton was made aware of the fraudulent practices at Global at various points throughout the scheme.

Specifically, Judith Reynolds testified that she expressed her concerns about certain practices at Global at a meeting where Linton was present. Those practices involved unpaid co-pays and the receipt of duplicate therapies by patients—including sales representatives. Reynolds also highlighted that patients were receiving significantly more of a product than necessary and that Global employees were underbilling certain insurance companies to avoid reaching a cap.

Likewise, Stapp Harrison, another pharmacist at Global, testified that he took issue with some of the practices at the Clearwater Billing Center. Harrison testified that he noticed issues such as erroneous billing, which he relayed to Jamey Mays. Specifically, in a June 22, 2015, email to Mays, Harrison stated "I would like to reiterate that the billing center appears to be billing erroneously," noting that "we should not bill for something and

when not covered mark through it, and choose a different drug." Harrison then wrote "Jamey its [sic.] time for this to stop. I want better business practices." Thereafter, Mays forwarded the email to Jeremy Adams and Linton.

Despite learning of fraudulent conduct at Global, Linton made no effort to change any of her practices. Linton's inaction undermines her argument that lack of experience was to blame for her improper conduct. For all of these reasons, the evidence presented at trial is more than sufficient to sustain Linton's convictions for conspiracy, health care fraud, and mail fraud.

As for Linton's substantive aggravated identity theft convictions, Linton contends that the Supreme Court's recent decision in *Dubin v. United States*, 143 S.Ct. 1557 (2023), requires vacatur. We disagree.

In *Dubin*, the Supreme Court held that the words "use" and "in relation to" in 18 U.S.C. § 1028A should not be read so broadly that the statute would "apply automatically any time a name or other means of identification happens to be part of the payment or billing method used in the commission of a long list of predicate offenses." *Id.* at 1564–65. Instead, the Court explained that a "defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." *Id.* at 1573. Section 1028A's reach is thus limited to situations where "a genuine nexus" exists between the use of a means of identification and the predicate offense. *Id.* at 1565.

The Court clarified, however, that the statute still proscribes "use[s] [of a means of identification] involving fraud or deceit about identity[.]" *Id.* at 1570. *Dubin* thus redirects the statute's focus to "offenses built around what the defendant does with the means of identification in particular." *Id.* at 1568. "In other words, the means of identification specifically [must be] a key mover in the criminality." *Id.*

Again, Linton contends that, pursuant to *Dubin*, her aggravated identity theft convictions should be vacated. According to Linton, the jury instructions presented at trial were erroneous, and further, Section 1028A is an unconstitutionally vague statute.

As an initial matter, we review Linton's *Dubin*-related arguments under a plain-error standard. Linton did not object to the indictment or the jury instructions on the basis of the elements of the statute at issue in *Dubin*. "The plain-error standard applies even if, as is the case here, there were no legal grounds for challenging the instructions at the time they were given, but such legal grounds have since arisen due to a new rule of law arising between the time of conviction and the time of appeal." *United States v. Pelisamen*, 641 F.3d 399, 404 (9th Cir. 2011); *see United States v. Reed*, 941 F.3d 1018, 1020 (11th Cir. 2019) (reviewing a conviction for plain error where an intervening change in law altered the elements the government was required to prove under the charged statute). Plain error exists only if the defendant "demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the

[defendant's] substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 560 U.S. 258, 262 (2010) (citations omitted).

Linton cannot establish plain error because, even if the first two requirements are met, she has not established "a reasonable probability that the error affected the outcome of the trial." *Id.* Even under the circumscribed reading of Section 1048A set forth in *Dubin*, Linton's conduct falls within the statute's purview. Linton deliberately changed the addresses on file for Donald Edenfield, Doris Edenfield, and Derrick Wester to that of Jeremy Adams so that Global could continue billing for the products. In other words, Linton represented to the PBMs and insurance companies that Global was filling prescriptions for the Edenfields and Wester when, in reality, the products were being sent to Adams.

Linton's forgery of the Edenfields' and Wester's identities is at the heart of the deception: Linton used the identities of the Edenfields and Wester to continue refilling prescriptions in their names, even though they were neither aware of nor received any products. Because the deception centered on the identity of the individual receiving the product, Linton committed identity theft. *See Dubin*, 143 S.Ct. at 1568 ("This central role played by the means of identification, which serves to designate a specific person's identity, explains why we say that the 'identity' itself has been stolen."). The use of the fraudulent identities was central to the

scheme at Global; Linton's fraudulent representation that individuals such as the Edenfields and Wester were the recipients of the prescriptions issued in their names directly enabled Global to continue billing for medically unnecessary prescriptions.

Further, as to Robert Bowen, Linton obtained a prescription for additional medications on his behalf through the fraudulent use of Dr. John Almirol's means of identification. Dr. Almirol had signed and authorized a prescription for Robert Bowen. After emailing with Joshlyn Bowen, Linton fraudulently altered the already-signed prescription to permit Global to bill for additional medically unnecessary drugs without Dr. Almirol's knowledge. In other words, Linton affirmatively represented to the insurance companies and PBMs that Dr. Almirol had authorized the additional prescriptions when, in fact, he had not.

Linton's use of Dr. Almirol's means of identification is distinct from the conduct at issue in *Dubin*, where the defendant misrepresented only the qualifications of the professional who performed psychological testing on a patient to increase the reimbursement from Medicaid. *Dubin*, 143 S. Ct. at 1563–64. Linton's use of Dr. Almirol's identity was central to the deception: she used his "means of identification itself to defraud or deceive." *Id.* at 1568. The insurance companies and PBMs would not have provided reimbursement had they known that Dr. Almirol had not actually authorized the prescriptions. That Dr. Almirol had originally authorized at least one prescription for Robert Bowen is of no moment. *See id.* at 1568 n.6 (noting that the act of stealing an

identity can "include situations where [it] was initially lawfully acquired"). By explicitly using Dr. Almirol's identity to falsely represent to insurance and PBMs that the prescriptions were authorized, Linton appropriated Dr. Almirol's personal information to deceive others. *See id.* at 1570 ("As the definitions reveal, identity theft covers both when 'someone *steals* personal information about and belonging to another . . . and *uses* the information to deceive others[.]'" (quoting Black's Law Dictionary 894 (11th ed. 2019)). Thus, because Dr. Almirol's signature on the prescription form directly enabled Linton to bill for the medically unnecessary products, "the means of identification specifically [was] a key mover in the criminality." *Id.* at 1568.

In short, unlike in *Dubin*, Linton did not provide a service to a client while merely misrepresenting how the service was performed to inflate the bill. Rather, Linton used the means of identification of former patients and prescribing doctors to overbill for certain products. Linton's conduct thus falls squarely within the classic variety of identity theft left untouched by *Dubin*. Her use of the Edenfields' and Wester's identifying information was itself fraudulent or deceptive because Linton represented those patients were receiving the refills, despite shipping the product to Jeremy Adams. And her use of Dr. Almirol's means of identification was fraudulent because she falsely represented he had authorized the additional prescriptions for Robert Bowen.

Linton's mens rea argument similarly fails. Linton contends that because Section 1028A contains the word "knowingly," the

government must prove that Linton knew that the means of identification was at the crux of the health care fraud.

We need not opine on the correctness of Linton's reading of the mens rea requirement because even under her interpretation of the statute, the evidence at trial is more than sufficient to establish that she knew the means of identification of Donald and Doris Edenfield, Derrick Wester, and Dr. Almirol were "used . . . during and in relation to" the health care fraud conspiracy. First, the evidence that Linton rerouted prescriptions for Donald and Doris Edenfield and Derrick Wester to the address of Jeremy Adams demonstrates her knowledge that the means of identification were critical to the conspiracy. Linton knew that the Edenfields and Wester had asked to no longer receive refills of their prescriptions, yet she deliberately chose to continue billing insurance for prescriptions obtained in their names. Linton thus knew that the Edenfields' and Wester's means of identification were being used to further the conspiracy—indeed, she was the one who was using them.

Second, there is ample evidence that Linton knew that Dr. Almirol's means of identification were misappropriated. In her email to Linton, Joshlyn Bowen offered to return to Dr. Almirol to have him write an additional prescription for her husband. Linton declined this invitation, instead choosing to alter the prescription herself. Linton was thus aware that Dr. Almirol's means of identification would be used to permit her to bill for additional medications on Robert Bowen's behalf.

Finally, Linton's vagueness argument is unavailing. As the government correctly points out, Linton failed to preserve this argument: she neither argued it to the district court, nor did she raise it on appeal in her opening or reply briefs. While the question of vagueness was not directly before the Court in *Dubin*, the Court nevertheless made clear that "[t]he concurrence's bewilderment is not, fortunately, the standard for striking down an Act of Congress as unconstitutionally vague." *Dubin*, 143 S. Ct. at 1573 n.10. Under that guidance, we decline to find that Section 1028A is unconstitutionally vague.

### B.            John Gladden's Convictions

Gladden raises several challenges to his convictions for conspiracy, health care and mail fraud, and aggravated identity theft. We address his arguments in turn, and ultimately uphold his convictions for conspiracy, health care fraud, and mail fraud. But we vacate his conviction for aggravated identity theft.

While Gladden acknowledges that "there is no doubt that a conspiracy existed within Global to defraud various insurance companies," he contends there is insufficient evidence to find that he was aware of and willfully joined the conspiracy. We disagree.

The jury reasonably found that Gladden was aware of and joined the conspiracy at Global based on the email Gladden sent to Phillip Marks regarding Boyd's medically unnecessary prescriptions and the emails Gladden sent to his subordinates urging them to obtain prescriptions. Gladden's email to Marks, in which he wrote "AMAZING . . . of the 27 scripts, only 2 are for []

real patients . . . the other 25 appear to be for [Boyd]," undermines any claim that he was unaware of the scheme at Global. *See United States v. Gonzalez*, 834 F.3d 1206, 1216 (11th Cir. 2016) (finding a jury could infer knowledge based on evidence that the defendant knew she was providing services that were not medically necessary). The email exchange between Gladden and Megan Rumble, where Rumble stated "I run into issues every month getting my RXs filled along with the appropriate ones," further supports the jury's finding that Gladden was privy to the scheme at Global.

Not only was Gladden aware of the scheme at Global; he capitalized on it. In one email to his subordinates, Gladden wrote "everyone should have a personal script for yourself, spouse, and family members" and that he "[would] be monitoring this to make sure that ALL OF TEAM GEORGIA has [their prescriptions]." When Dawn Whitten responded to Gladden that she was worried that obtaining prescriptions she did not need would raise "red flags," he did not share her concern. Instead, he said she should have her endocrinologist "buddy" write her a prescription for a topical cream. Thus, the jury could reasonably have interpreted Gladden's emails as a directive to his subordinates to obtain medically unnecessary prescriptions.

As for Gladden's health care and mail fraud convictions, he argues that (1) there was insufficient evidence that the prescriptions were medically unnecessary, given that it is not per se illegal for sales representatives to obtain prescriptions for themselves or their

family members; and (2) there was insufficient evidence of a specific intent to defraud. We are unpersuaded.

With respect to Gladden's convictions for health care fraud, the evidence presented at trial overwhelmingly demonstrates Gladden's knowledge that the prescriptions obtained by Whitten for herself and her family members were medically unnecessary. *See Medina*, 485 F.3d at 1297 (stating that, to sustain a conviction for health care fraud under Section 1347, the government must prove that the defendant knew that the submitted claims were false). Gladden's argument that it is not per se illegal for sales representatives to obtain prescriptions for themselves or their family members is unavailing. The emails from Gladden to his subordinates—in which he directed them to obtain prescriptions before any of them had visited a doctor—supports the jury's inference that Gladden knew the prescriptions were medically unnecessary. *See United States v. Grow*, 977 F.3d 1310, 1322 (11th Cir. 2020) (per curiam) (finding sufficient evidence of Defendant's knowledge of healthcare fraud where "there was evidence that [Defendant] and his representatives told the telemedicine doctors what to prescribe before the doctors consulted with recruits"); *United States v. Melgen*, 967 F.3d 1250, 1255–57 (11th Cir. 2020) (upholding a conviction for healthcare fraud where the scheme involved a doctor "pre-filling" patient forms so that the eye condition was a default diagnosis before the doctor even met with a patient).

These emails also support Gladden's mail fraud conviction. Despite Whitten's email explaining that neither she nor her family members had any medical need for the prescriptions Gladden was encouraging her to obtain, Gladden nevertheless told her to get a "buddy" to write the prescriptions. This email exchange sufficiently evinces the intent to defraud necessary to sustain Gladden's mail fraud conviction. *See Wheeler*, 16 F.4th at 819 ("To prove that a defendant had the intent to defraud, the Government has to prove that the defendants either knew they were making false representations or acted with 'reckless indifference to the truth.'").

However, *Dubin* requires that we vacate Gladden's conviction for aggravated identity theft. Because Gladden did not raise a *Dubin* claim in the district court proceedings or on appeal, we review for plain error.

As an initial matter, we disagree with the government's contention that "there is no error or defect in the indictment or jury instruction." Rather, *Dubin* makes clear that the jury instruction for aggravated identity theft is erroneous at least in part because one sentence in the jury instruction—"[t]he means of identification at least must facilitate, or have the potential of facilitating, the crime alleged in the indictment"—suggests that mere facilitation of the predicate offense is sufficient to support a conviction. The Court in *Dubin* rejected such a broad reading of Section 1028A. *Dubin*, 143 S.Ct. at 1573. Because *Dubin* made clear that "being at the crux of the criminality requires more than . . .

facilitation of the offense," the jury instruction was erroneous. *Id.* (internal quotation marks omitted).

Further, we find that this error "affected the outcome of the district court proceedings" as to Gladden. *Marcus*, 560 U.S. at 262. Gladden's conviction for aggravated identity theft was based on the prescription that Whitten obtained for her minor daughter. Whitten testified that the prescription in question was not medically necessary, and that it was obtained using a pre-filled prescription. The deception at the heart of Whitten and Gladden's conduct, then, was obtaining the medically unnecessary prescriptions. The use of Whitten's daughter's identifying information was merely ancillary to the deception; indeed, at no point did Whitten and Gladden misrepresent who received the prescriptions. *See Dubin*, 143 S.Ct. at 1565 ("When a means of identification is used deceptively, this deception goes to 'who' is involved, rather than just 'how' or 'when' services were provided.").

The conduct underlying Gladden's identity theft conviction is thus distinct from Linton's. While Linton misrepresented who was receiving the prescriptions, Gladden's misrepresentation to the insurance companies and PBMs involved only whether the prescriptions were medically necessary. This conduct was illegal—as we discuss above—but it was not aggravated identity theft.

The government's reliance on *United States v. Michael*, 882 F.3d 624 (6th Cir. 2018), is misplaced. There, the Sixth Circuit found identity theft where the defendant used both the doctor and

the patient's identifying information to "fashion a fraudulent submission out of whole cloth." *Id.* at 629. Here, in contrast, Gladden did not forge the name of the prescribing doctor on the prescription. Nor did he misrepresent who would be receiving the filled prescription. Rather, Whitten had her "doctor buddy" write a prescription for her minor daughter, which she was lawfully entitled to do. The only misrepresentation that occurred was whether the prescription was medically necessary. Because a reasonable jury could not convict Gladden of identity theft under the standard articulated in *Dubin*, fairness dictates we vacate his conviction. *See Marcus*, 560 U.S. at 262.

### C.                Forfeiture and Restitution

Only Gladden challenges the district court's forfeiture and restitution orders. Gladden argues that the restitution and forfeiture orders exceed the amount of loss that his actions caused. Pursuant to *Medina*, he insists that his restitution and forfeiture amounts should be limited to "the amount of loss the government proved the victim PBMs suffered when they paid for these prescriptions," rather than all of the income and prescriptions Gladden's sales representatives generated.

The government argues that the district court did not clearly err in imposing Gladden's restitution amount, as it is supported by the total amount of loss attributable to him. Given the reimbursements for medically unnecessary prescriptions that Gladden directed others to obtain for themselves and their family members, the government contends that $134,772.86 is a

reasonable estimate of loss. As for forfeiture, the government argues that the district court did not clearly err in ordering forfeiture in the amount of $157,587.33. The calculated forfeiture amount represents the net proceeds Gladden received during his time at Global minus a $10,000 payment from Global that predated his employment. Thus, the government contends that "the district court reasonably estimated that Gladden's salary represented gross proceeds traceable to" the fraud because he would not have received the money but for "his active participation in the fraudulent conspiracy at Global."

We first address Gladden's arguments as to restitution, before moving on to forfeiture.

### 1.    Restitution

The Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, requires a defendant convicted of fraud to pay restitution to the victims of his offense. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). The government bears the burden of proving the amount of loss by a preponderance of the evidence. *Id.* § 3664(e). However, "the government need not calculate the victim's actual loss with laser-like precision, but may instead provide a 'reasonable estimate' of that amount." *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015).

Under the MVRA, an entity is a "victim" if it suffered "harm that directly and proximately result[ed] from the commission of" the offense. *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (internal quotations omitted). "[T]he government must

show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *Id.* (quotations omitted). In healthcare fraud cases, restitution amounts must be offset by the value of medically necessary goods and services that were provided. *United States v. Bane*, 720 F.3d 818, 828 (11th Cir. 2013). "The defendant bears the burden to prove the value of any medically necessary goods or services he provided that he claims should not be included in the restitution amount." *Id.* at 829 n.10.

We find no reason to disturb the district court's restitution order. The evidence presented at trial demonstrates that Gladden was an active participant in the conspiracy at Global and directed his subordinates to take out medically unnecessary prescriptions. *See United States v. Whitman*, 887 F.3d 1240, 1248 (11th Cir. 2018) (explaining that the district court may hold all participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators that are "within the scope of the jointly undertaken criminal activity [and] in furtherance of" the activity (internal quotations omitted)). The district court thus did not clearly err in basing restitution on the medically unnecessary prescriptions that Gladden directed his subordinates to obtain.

Further, Gladden does not dispute Gerhardt's calculations of the loss amount caused by the medically unnecessary prescriptions. However, Gladden argues that, under *Medina*, a prescription is

medically necessary and should not be used to calculate restitution so long as some of the medicine was used.

Gladden's reliance on *Medina* is misplaced. First, nowhere in *Medina* did this Court hold that a prescription is medically necessary so long as the intended recipient used some of the drug. *See generally Medina*, 485 F.3d at 1304–05 (holding that the district court clearly erred when it did not make specific factual findings on which to base the loss amounts attributable to each defendant). Second, in *Medina*, this Court found the district court committed clear error where there was "no evidence presented" that the claims at issue were not medically necessary. *Id.* at 1304. Here, in contrast, the district court did not clearly err in finding that the claims were not medically necessary. The evidence at trial was sufficient to establish that Whitten and Rumble did not have a medical need for the prescriptions they were obtaining. The district court's restitution order stands.

### 2.    Forfeiture

A defendant convicted of health care fraud must forfeit property "that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). To evaluate whether "gross proceeds" are "traceable to the commission of the offense," this Court applies a but-for standard. *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009). A defendant's salary may be the proper measure of forfeiture where "the fraud was pervasive and the [company's]

21-11621               Opinion of the Court                    32

operations could not have continued at all without [the fraud]."
*United States v. Moss*, 34 F.4th 1176, 1195 (11th Cir. 2022).

Relevant here, the D.C. Circuit has applied a but-for test to determine whether a forfeiture ordered under Section 982(a)(7) excludes legitimate services from proceeds. *See United States v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019) (per curiam); *see also Moss*, 34 F.4th at 1195 (citing *Bikundi* favorably in discussing but-for reasoning in forfeiture cases). The *Bikundi* court held that forfeiture ordered under Section 982(a)(7) did not exclude legitimate services from proceeds where the money obtained from the fraud had propped up the defendants' legitimate services. *Bikundi*, 926 F.3d at 793. On appeal, defendants challenged the forfeiture of the entirety of the Medicaid proceeds received by defendants' company, despite the district court's acknowledgement that the company provided and was reimbursed for some legitimate services unconnected to the health care fraud offenses. *Id.* at 792–93.

In upholding the forfeiture order, the D.C. Circuit first emphasized the breadth of the statute that authorizes forfeiture in health care fraud cases, noting that "'[g]ross proceeds traceable to' the fraud include 'the total amount of money brought in through the fraudulent activity, with no costs deducted or set-offs applied.'" *Id.* at 792 (citing *United States v. Poulin*, 461 F. App'x 272, 288 (4th Cir. 2012)). Thus, the court noted that "whereas other forfeiture statutes allow credit for 'lawful services,' . . . the statute for health care fraud does not." *Id.* at 793.

The *Bikundi* court found no error in the district court's determination that the total payments received constituted or were derived from gross proceeds traceable to the health care fraud offenses because "the pervasive fraud was integral to each and every Medicaid payment" to the company. *Id.* The district court based this determination on the finding that the company "would not have operated *but for* [each] defendant's fraud" and that the total Medicaid proceeds received were "*only* paid due to the defendants' persistent and rampant fraudulent conduct." *Id.* (quotations omitted).

Here, the district court's forfeiture amount—$157,587.33—represents a subset of the $167,587.33 in salary that Gladden was paid by Global in 2015. The district court based this amount on the determination that, at the time of the scheme, Global was permeated with fraud and that "but for the long-running health-care-fraud conspiracy perpetrated by Defendant Gladden and others, it would not have existed in the form in which it did, generated anywhere near the revenue that it did, or paid Defendant his $167,587.33 salary in 2015."

Like in *Bikundi*, the evidence demonstrates that Global's legitimate operations were facilitated by the illegitimate operations. Gladden has presented no evidence calling the factual accuracy of the district court's statement into question; there is nothing to suggest that this was clear error by the district court. Gladden's salary is thus the proper subject of forfeiture because, in the absence of the conspiracy in which Gladden participated,

Global would not have employed and compensated Gladden the way that it did. In the language of the statute, Gladden's salary constitutes the gross proceeds traceable to the commission of the offense, because in the absence of Gladden's—and the other conspirators'—conduct, it is unlikely that Global would have been able to continue operations in the manner that it did. Even if Gladden did participate in some legitimate transactions during his time at Global, these transactions were propped up by the illegitimate transactions.

The district court thus did not clearly err in determining that Global's operations were so pervaded by fraud that Gladden would not have received his salary but for the scheme. The district court's forfeiture order stands.

**IV**

For the reasons stated above, we conclude that the evidence presented at trial was sufficient to support the jury's verdict as to all of Jessica Linton's convictions and as to John Gladden's convictions for conspiracy, health care fraud, and mail fraud. In addition, the district court did not clearly err in calculating John Gladden's restitution and forfeiture amounts. However, because John Gladden's use of the means of identification of Dawn Whitten's minor daughter was merely ancillary to the health care fraud, we vacate his conviction for aggravated identity theft and remand for further proceedings consistent with this opinion.

**AFFIRMED** as to Jessica Linton and **AFFIRMED IN PART, VACATED IN PART, AND REMANDED** as to John Gladden.