# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
December 1, 2023

Lyle W. Cayce
Clerk

No. 21-50380
Consolidated with
No. 22-50659

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Bradley Lane Croft,

*Defendant—Appellant*.

———————————————————————

Appeals from the United States District Court
for the Western District of Texas
USDC No. 5:18-CR-603-1

———————————————————————

Before Graves, Higginson, and Ho, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

In 2019, Bradley Lane Croft was convicted of four counts of aggravated identity theft under 18 U.S.C. § 1028A.[1] After this court affirmed those convictions, the Supreme Court decided *United States v. Dubin*, 599 U.S. 110,

———————————

[1] Croft was also convicted of eight counts of wire fraud, two counts of money laundering, and two counts of making false tax returns. As discussed in this opinion, these convictions are not challenged on remand.

132 (2023), which articulated a new standard for convictions under § 1028A. Subsequently the Supreme Court granted certiorari in this case, vacated this court's judgment, and remanded for consideration in light of *Dubin*. *United States v. Croft*, 143 S. Ct. 2635 (2023). Croft asks that this court vacate his convictions under § 1028A and remand this case for resentencing. During the pendency of this case, Croft also filed a pro se appeal after the district court denied his third motion for a new trial, in which he alleged newly discovered evidence that the government should have, but did not, produce under *Brady v. Maryland*, 373 U.S. 83 (1963). At the same time, he moved for release pending appeal, arguing that he was likely to prevail in his direct appeal and his pro se appeal. Because of the interrelatedness of Croft's direct and pro se appeals, No. 21-50380 and 22-50659, we sua sponte consolidate these cases.

Having evaluated the evidence adduced at Croft's trial under the "crux of the criminality" standard articulated in *Dubin*, we AFFIRM Croft's four convictions under § 1028A. We further AFFIRM the district court's denial of Appellant's motion for a new trial, and DENY AS MOOT his motion for release pending appeal.

I.

Croft owned and operated Universal K-9, a school that primarily trained handlers and dogs for police work. Croft sought to expand the business by offering courses to veterans, who would pay tuition using G.I. Bill funds paid by the Department of Veterans Affairs (VA). However, to be eligible to receive such funds, Universal K-9 had to first obtain certification from the Texas Veterans Commission (TVC), the state agency designated by the VA to approve educational institutions and programs that sought to receive certain kinds of veterans' educational benefits. For a program like the dog handling program, certification depended on the organization's

2

employment of dog trainers with certain qualifications, and Croft was required to attach to his application a roster listing Universal K-9's instructors and administrative staff along with instructor qualifications.

Over the course of several years, Croft submitted multiple applications to the TVC.  Finally, via application of March 2016, Universal K-9 was certified by the TVC, and accepted by the VA, in June 2016.  On the March 2016 application that the TVC approved, Croft listed four instructors whose duties were teaching classes and training dogs: Wes Keeling, Dustin Bragg, Jesse Stanley, and Art Underwood.  The application included several certificates showing the qualifications of these four instructors.

However, at trial, Keeling, Bragg, and Stanley testified that, while they had prior involvements with Universal K-9, they had never given their permission to be named as instructors for the purposes of the TVC application, nor had they actually served as instructors for the courses listed. The fourth trainer listed on the roster, Underwood, died in March 2014, two years before Croft certified to the TVC that he would be a trainer at Universal K-9. Rufus Coburn, the Assistant Director of the TVC during the relevant timeframe, testified that Universal K-9's application would not have been approved without the names of the instructors, their qualifications, and information about the classes they would teach.

After a bench trial, Croft was convicted of eight counts of wire fraud, four counts of aggravated identity theft, two counts of money laundering, and two counts of making or subscribing a false tax return. He was sentenced to 70 months of imprisonment on the wire fraud and money laundering counts, 36 months of imprisonment on the false tax return counts, and 24 months of imprisonment on two of the aggravated identity theft counts, all to be served concurrently. Croft was sentenced to 24 months of imprisonment on each of the remaining two aggravated identity theft counts, to be served

No. 21-50380
c/w No. 22-50659

consecutively with each other and the above sentences, for a total of 118 months. His sentence also included supervised release, forfeiture, and restitution.

## II.

This court affirmed the district court's judgment on direct appeal, determining that the evidence was sufficient to support Croft's convictions of wire fraud, aggravated identity theft, and money laundering, and rejecting challenges to the orders of forfeiture and restitution. *See United States v. Croft*, No. 21-50380, 2022 WL 1652742, at *2–6 (5th Cir. May 24, 2022) (per curiam). To do so, it relied on *United States v. Dubin*, 27 F.4th 1021, 1021-22 (5th Cir. 2022) (en banc). *See Croft*, 2022 WL 1652742, at *4. However, the Supreme Court then vacated and reversed the en banc *Dubin* decision, *Dubin v. United States*, 599 U.S. at 132, then vacated this court's judgment in Croft's appeal and remanded for further consideration in light of its *Dubin* decision. *See Croft*, 143 S. Ct. 2635.

When a case is remanded from the Supreme Court, with the "[e]xcept[ion] [of] that which we are mandated to review, our previous rulings are the law of the case and will not now be reconsidered." *Gradsky v. United States*, 376 F.2d 993, 996 (5th Cir. 1967). Accordingly, we consider only whether Croft's four convictions for aggravated identity theft should be upheld under *Dubin*.

## III.

The aggravated identity theft statute provides that "[w]hoever, during and in relation to" certain enumerated felonies, including wire fraud, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." U.S.C. 18 § 1028A(a)(1), §1028A(c) (listing enumerated felonies). The term

4

"means of identification" is defined in relevant part as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." *Id.* § 1028(d)(7).

But the statute itself does not define the meaning of "during and in relation to." In *Dubin*, the Supreme Court set out to clarify this meaning, holding that not every instance in which a person uses another person's means of identification "during" a fraud is "in relation to" that fraud such that it constitutes aggravated identity theft. The Court held that, under § 1028A(a)(1), "[a] defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." *Dubin*, 599 U.S. at 131. The Court added that, "[t]o be clear, being at the crux of the criminality requires more than a causal relationship, such as 'facilitation' of the offense or being a but-for cause of its 'success.'" *Id.* (some internal quotation marks omitted). For crimes that involve fraud or deceit, "the means of identification specifically must be used in a manner that is fraudulent or deceptive. Such fraud or deceit going to identity can often be succinctly summarized as going to 'who' is involved." *Id.* at 132.

In that case, the defendant overbilled Medicaid by inflating the qualifications of an employee who performed a test and claiming a higher reimbursement based on those qualifications. *Dubin*, 599 U.S. at 114. The defendant billed Medicaid as if the test had been done by a licensed psychologist, when in fact it had been done by a more junior "psychological associate." *Id.* The fraudulent bill submitted by the defendant included a patient's name and Medicaid reimbursement number, which are "means of identification." *Id.* at 115. Because he misrepresented the employee's qualifications and overbilled Medicaid, the defendant was convicted of healthcare fraud pursuant to 18 U.S.C. § 1347. *Id.* at 114. Because he used a patient's name and Medicaid number, he was convicted of aggravated

No. 21-50380
c/w No. 22-50659

identity theft based on his unlawful use of a means of identification. *See Dubin*, 599 U.S. at 114-15.

The Supreme Court reversed the aggravated identity theft conviction, determining that the "means of identification" used—the patient's name— "was not at the crux of what made the underlying overbilling fraudulent" but was merely "an ancillary feature of the billing method employed." *Id.* Rather, "the crux of the healthcare fraud was a misrepresentation about the qualifications of [an] employee." *Id.* The Court explained that the fraud at issue "was in misrepresenting *how* and *when* services were provided to a patient, not *who* received the services." *Id.* The Court thus concluded that there had not been a "use [of] the patient's means of identification in relation to a predicate offense within the meaning of § 1028A(a)(1)." *Id.*

We now turn to analyzing *Croft* within the framework articulated by the Supreme Court in *Dubin*.

IV.

On remand, Croft argues that, because neither he nor any other Universal K-9 employee falsely claimed to be one of the four individuals Croft submitted in the application, no aggravated identity theft occurred. But *Dubin* did not hold that the defendant in that case was innocent of aggravated identity theft because he did not present himself to be someone else. Rather, it held that when a predicate felony involving "fraud and deceit crimes" hinges on "*how* and *when* services were provided to a patient, not *who* received the services," *Dubin*, 599 U.S. at 132, it cannot sustain an aggravated identity theft conviction. As the Eleventh Circuit has explained, "Section 1028A's reach is thus limited to situations where 'a genuine nexus' exists between the use of a means of identification and the predicate offense." *United States v. Gladden*, 78 F.4th 1232, 1244 (11th Cir. 2023).

6

In *Dubin*, the Supreme Court identified a mismatch between the "crux" of the predicate felony—overbilling Medicaid by misrepresenting Person A's qualifications—and the § 1028A conviction that the government argued the predicate felony supported—the incidental use of Person B's name and Medicaid ID on the billing statement. Because the billing statement was rendered fraudulent by the misrepresentation about Person A, and not by the misrepresentation about Person B, Person B's means of identification was not used "in relation to"—that is, central to—the predicate offense of fraud.

There is no such mismatch here. Croft's misrepresentations about "who" was teaching courses at Universal K-9 were the basis—and "heart of"—his wire fraud convictions. *See Dubin*, 599 U.S. at 123; *see also Gladden*, 78 F.4th at 1245 ("[Defendant's] forgery of the [victims'] identities is at the heart of the deception."). Trial testimony established that Universal K-9's March 2016 application to the TVC was fraudulent because it identified Keeling, Bragg, Stanley, and Underwood as qualified trainers who worked for the company and would be teaching the classes to veterans. In his letter brief to this court, Croft acknowledges that the trial court heard evidence that he identified these four men as instructors "to receive VA approval to open his dog-handler training school" but that "none of the four individuals ever reported to work." He further acknowledges that "three of these individuals testified that they did not give Croft permission to put their names on the application," and that the fourth individual was deceased.

Rufus Coburn of the TVC testified that the roster of instructors and their qualifications was "particularly important" to the application, and that veterans would not get G.I. Bill benefits if they took courses with unapproved instructors. Far from being "ancillary feature[s]" of Croft's application to the TVC, the material misrepresentations that Croft made—that these four men were qualified instructors employed by Universal K-9 to teach classes to

veterans—were the basis of his conviction for the predicate felony of wire fraud.[2] As is required by *Dubin*, the use of the four men's names and information was "at the crux of what made the underlying [conduct] fraudulent." *Dubin*, 599 U.S. at 132.

Croft presents his claim to us as one of evidentiary insufficiency, arguing that the government failed in its burden to prove with convincing force that his use of a means of identification of others was integral, not ancillary, to his wire fraud predicate offense. *See generally United States v. Cosentino*, 869 F.2d 301, 308-09 (7th Cir. 1989). We answer this evidentiary argument by affirming that the government met its "core" or "crux" burden under *Dubin*. At its core, Croft's application to the TVC was fraudulent because of his misappropriation of the victim trainers' means of identification. This theft was the "key mover in [his] criminality." *Dubin*, 599 U.S. at 122-123.

## V.

In the light of *Dubin*, the evidence supports the trial court's findings that Croft used means of identification belonging to Keeling, Bragg, Stanley, and Underwood during and in relation to wire fraud. Accordingly, we AFFIRM his convictions and sentences for the four aggravated identity theft counts. This court has also considered Croft's pro se appeal of the district court's denial of his motion for a new trial under *Brady*, 373 U.S. 83, and we hold that the district court properly denied that motion. Finally, since this court has adjudicated both underlying appeals on the merits, and held that

_____

[2] Indeed, in his written closing argument to the trial court, Croft argued that "the government must first establish that there is *Aggravated Identity Theft* in order for there to be *Wire Fraud*."

No. 21-50380
c/w No. 22-50659

Croft's convictions stand, we DENY AS MOOT his motion for release pending appeal.

No. 21-50380
c/w No. 22-50659

JAMES C. HO, *Circuit Judge*, dubitante:

Congress has defined "aggravated identify theft" in admittedly broad terms: Anyone who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person"—and does so "during and in relation to" certain enumerated felonies such as Medicaid or wire fraud—is subject to a mandatory two-year term of imprisonment. 18 U.S.C. § 1028A(a)(1).

On its face, this language doesn't just cover those acts that people would ordinarily consider "identity theft." It also appears to include acts that we might not consider "identity theft" in the colloquial sense—but that plainly constitute theft involving the use of another person's identity. For example, it would cover a person who is authorized to use another person's identity to charge a certain amount—but who then abuse that authority to charge some additional, impermissible sum.

Or at least that's what the United States—and this court—thought. In *United States v. Dubin*, 27 F.4th 1021 (5th Cir. 2022) (en banc), a majority of our en banc court adopted the position of the United States and affirmed the § 1028A(a)(1) convictions accordingly.

But that view was subsequently rejected by the Supreme Court. 599 U.S. 110 (2023). The Court dismissed the notion that § 1028A(a)(1) covers "defendants who fraudulently inflate the price of a service or good they actually provided." *Id.* at 114. Such a reading, the Court feared, might sweep in "[a] lawyer who rounds up her hours from 2.9 to 3," or "a waiter who serves flank steak but charges for filet mignon." *Id.* It might encompass "[e]very contractor who has rounded up his billed time by even a few minutes," and "[e]very bill splitter who has overcharged a friend." *Id.* at 133 (Gorsuch, J., concurring in the judgment).

No. 21-50380
c/w No. 22-50659

In anticipation of these hypotheticals, the Solicitor General acknowledged that her reading would sweep in modest acts of theft. But she nevertheless maintained that hers was the correct reading of the statute. *See* U.S. Br. 21 (proposed hypotheticals present "archetypal scenarios in which a defendant 'uses, without lawful authority, a means of identification' in furtherance of a predicate crime"); *see also* Oral Arg. Tr. 65–66.

The Solicitor General's views are well taken. Congress could have included a minimum loss requirement in § 1028A(a)(1). But it did not do so. Instead, Congress decided that "the small fraud is going to be punished the same way as the big fraud," as the United States put it during oral argument. Oral Arg. Tr. 66. Congress imposed "a flat two-year penalty, regardless of the size of the fraud in a particular case." *Id.*

That's a judgment call for legislators to make. *Cf. Ewing v. California*, 538 U.S. 11 (2003); *Rummel v. Estelle*, 445 U.S. 263 (1980). And it's a reasonable one for them to make. If you take only a modest item from a local CVS, you're still a shoplifter. If you grab just a few dollars worth of quarters from a parked car, you're still a thief. *Cf.* George L. Kelling & James Q. Wilson, *Broken Windows*, THE ATLANTIC, March 1982 (discussing social consequences when "courts do not punish petty [offenses]").

Moreover, the purported absurdity of applying § 1028A(a)(1) to even minor economic losses proves too much. After all, no one would dispute that § 1028A(a)(1) criminalizes prototypical acts of identity theft, even when they cause only a small economic loss. A person who steals your identity just to buy a meal at McDonald's is still subject to a flat two-year prison sentence.

The real underlying concern appears to be that § 1028A(a)(1) covers acts that just don't look like the sort of "identity theft" that legislators thought they were targeting. Admittedly, not every theft involving the use of another person's identity will sound like identity theft to the lay person.

No. 21-50380
c/w No. 22-50659

But it is the statutory text, not Congress's subjective expectations, that is supposed to govern the interpretive process. *See*, *e.g.*, *Smith v. United States*, 508 U.S. 223, 239 (1993) ("It may well be that Congress, when it drafted the language of § 924(c), had in mind a more obvious use of guns in connection with a drug crime, but the language of the statute is not so limited . . . Whether guns are used as the medium of exchange for drugs sold illegally or as a means to protect the transaction or dealers, their introduction into the scene of drug transactions dramatically heightens the danger to society.") (quoting *United States v. Harris*, 959 F.2d 246, 262 (D.C. Cir. 1992)) (cleaned up); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) ("[M]ale-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

In any event, that's why a majority of our court—including every member of this panel—endorsed the United States position. But that position has now been rejected by the Supreme Court. And it goes without saying that we're duty bound to follow Supreme Court precedent, whether we agree with it or not. *See*, *e.g.*, Akhil Reed Amar, America's Unwritten Constitution 232 (2012).

So it doesn't matter if I'm sympathetic with the panel majority's decision to affirm the convictions in this case, in light of the breadth of the governing text.[1]    Nor does it matter if I'm sympathetic with Justice

---

[1] I was a member of the panel that originally affirmed Croft's conviction, prior to the Supreme Court's decision in *Dubin*. *See United States v. Croft*, 2022 WL 1652742 (5th Cir.).

Gorsuch's concern that the test articulated in *Dubin* may present "intractable interpretive challenges of their own." 599 U.S. at 135.

All that matters is that we faithfully interpret and apply the Supreme Court's decision in *Dubin*. And in that spirit, I wonder if *Dubin* requires us to reverse the § 1028A(a)(1) convictions presented in this case.

*Dubin* holds that a person has committed aggravated identity theft under § 1028A(a)(1) only if his use of another person's identity is "at the crux of what makes the conduct criminal"—and not if the person's identity is merely "ancillary" to the crime. *Id.* at 131–32.

The panel majority reasonably theorizes that *Dubin* doesn't foreclose affirmance here because Croft's "application would not have been approved without the names of the instructors, their qualifications, and information about the classes they would teach." *Ante*, at 3.

But it would also be reasonable to respond that the real "crux" of Croft's fraud turned, not on any person's name, but rather on their qualifications to teach.

In *Dubin* itself, for example, the Court concluded that the crux of the fraud was the qualifications of the defendant's employee—not the name of the consumer. The defendant's "use of the patient's *name* was not at the crux of what made the underlying overbilling fraudulent. The crux of the healthcare fraud was a misrepresentation about the *qualifications* of [the defendant's] employee. The patient's *name* was an ancillary feature of the billing method employed." *Dubin*, 599 U.S. at 132 (emphasis added).

Put simply, the "fraud was in misrepresenting *how* and *when* services were provided . . . , not *who* received the services." *Id.*

So how do the principles articulated in *Dubin* cut in this appeal? Was the crux of the fraud here the *names* of the defendant's employees—or their

No. 21-50380
c/w No. 22-50659

*qualifications*?  Was the crux of Croft's fraud "*who* received the services"—or who delivered them?  Or was it "*how* . . . services were provided"?

Be that as it may, a majority of the panel has decided to affirm, and they do so in a typically thoughtful opinion.  I respect the decision of my distinguished colleagues, even if I am personally not so sure that affirmance can be reconciled with *Dubin*.  If nothing else, this case may help illustrate Justice Gorsuch's observation that the new test announced by the Supreme Court in *Dubin* could prove difficult to administer in practice.

14