[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12744

Non-Argument Calendar

_____

WILLIAM RICHARD CARTER, JR.,
a.k.a. Rick,

                                        Defendant-Appellant,

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

D.C. Docket No. 2:21-cr-00049-MHT-JTA-3

———————————————

Before ROSENBAUM, GRANT, and LAGOA, Circuit Judges.

PER CURIAM:

William Richard Carter, Jr., appeals his convictions for conspiracy, wire fraud and aiding and abetting, and aggravated identity theft and aiding and abetting. On appeal, Carter argues that the government materially varied from the indictment by eliciting testimony about Carter's role in an uncharged conspiracy; that the district court constructively amended the indictment by instructing the jury as it did on the conspiracy charge; and that the district court plainly erred with respect to its jury instructions for aggravated identity theft. For the following reasons, we affirm.

**I.**

Carter was indicted by a grand jury as part of a multi-party conspiracy with codefendants Trey Holladay ("Mr. Holladay"), Deborah Holladay ("Mrs. Holladay"), Gregory Corkren, David Tutt, and Thomas Sisk. Carter was charged with: one count of conspiracy either to commit any offense against the United States or to defraud the United States, in violation of 18 U.S.C. § 371; eighty-five counts of wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2[1]; and thirty-five counts of

———————————

[1] Before trial, six of these counts were dismissed.

aggravated identity theft and aiding and abetting, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2.

The indictment alleged the following facts regarding the defendants' fraudulent scheme. In 2015, Mr. Holladay, the superintendent of Athens City Schools ("ACS"), a public school district in Athens, Alabama, received approval from the Alabama State Department of Education ("ASDE") to implement Athens Renaissance School ("ARS") as a virtual and blended K-12 public school. ASDE approved Mr. Holladay's request on the understanding that ACS would receive state funding only for full-time students at ARS.

Mr. Holladay then allegedly worked with both Corkren and Carter to convince private schools to permit ACS to enroll their students in ARS. In exchange, they offered payments and other incentives to the private schools. Corkren, a retired teacher and friend of Mr. Holladay's, formed Educational Opportunities and Management, LLC ("Ed Op"), which contracted with ACS to recruit private schools to participate in the scheme. The indictment alleged that ACS would pay $45 to Ed Op per month for each student, and Mr. Holladay would receive a portion of the profits in cash. Corkren and Carter allegedly worked together to create false verification release forms—which represented that the relevant students had unenrolled from their private schools before enrolling in ARS—false enrollment forms, and false report cards and grade lists.

The indictment also alleged that Mr. Holladay and Corkren struck a deal with Sisk, the superintendent of Limestone County, Alabama, School District ("LCS"), which also had a virtual

education program, Limestone County Virtual School ("LCVS"). Pursuant to this deal, the indictment alleged that Ed Op assisted in obtaining additional enrollment for LCVS for $55 per month for each student.  Corkren would then allegedly set aside a portion of this payment and deliver it to a certain charity requested by Sisk. Carter, however, was not mentioned in any of the allegations concerning LCS or LCVS.

In 2017, Tutt and Mrs. Holladay allegedly became involved in the scheme.  The indictment also alleged that Corkren withdrew some of the money ACS and LCS paid to Ed Op and gave it to Mr. Holladay and Carter, among other codefendants.

The indictment charged the above facts as a single conspiracy, which constituted Count 1.  Among the counts of aggravated identity theft were Counts 125 and 126, which involved the victims "A.H." and "A.D.," who were students of Southern Academy, one of the participating private schools.

Carter was the only codefendant to go to trial.[2]  The trial lasted for over two weeks, and nearly one hundred witnesses testified.

Thomas Bice, a former state superintendent of education, testified that Alabama public school funding was based on how

---

[2] Mr. Holladay, Sisk, Tutt, and Corkren all pled guilty to one or more of the charged counts.  And the government moved to dismiss Mrs. Holladay's indictment as part of its agreement with Mr. Holladay, which the district court granted.

many students were enrolled in a school system for the first twenty days after Labor Day. He further testified that, if a student was enrolled simultaneously in a public school and a non-public school, that enrollment would not count towards a public school's state funding. And he stated that Alabama did not authorize the enrollment of full-time private school students as full-time public students for funding purposes. However, because Alabama's system did not track students enrolled in private school, Bice acknowledged that ASDE would have no way of knowing if that occurred.

Marc Mickleboro, the former headmaster at Southern Academy, testified about Mr. Holladay, and a man he assumed to be Carter, approaching him in 2015 to offer technology upgrades and other incentives in exchange for student information. Southern Academy later agreed to participate in the program.

Both Amelia Harrison, who is the victim for Count 125, and Anna Katherine Day, who is the victim for Count 126, testified that they graduated from Southern Academy in 2018. And both only took Spanish class online. Neither Harrison nor Day recognized a report card that bore their name from ARS, although the information displayed on the report card was similar to information regarding the classes they took while attending Southern Academy. Charles Stringham, an employee for ASDE, testified that both Harrison and Day were included in ACS's 2016 submission for funding purposes.

Corkren then testified to the following. Mr. Holladay wanted him to participate in a scheme to recruit private school

6                    Opinion of the Court                22-12744

students for ACS's virtual education program so that ACS could receive $5,600 in funding from the state for each student. Mr. Holladay told Corkren that he could not deal with the private schools directly and needed Corkren as a middleman. Mr. Holladay recommended that Corkren form Ed Op to contract with ACS, rather than work with ACS directly. Mr. Holladay told Corkren to report to Carter, who was essentially the head of ARS at that time. Corkren paid for a showcase, which was organized by Carter, for the various private schools that they wanted to participate in their scheme, during which Mr. Holladay and Carter persuaded four private schools to participate, including Southern Academy. Carter and Mr. Holladay instructed Corkren to collect enrollment forms from the participating private schools, after which he gave them to Carter. Corkren also sent Carter grades and other academic information. Carter would send Corkren a template to use when getting student information from the private schools. This information would then be entered into the ACS system.

Sisk testified to the following. Mr. Holladay explained to Sisk that Corkren could recruit additional students for LCVS. Sisk participated in a meeting with Mr. Holladay, Carter, and Corkren to discuss how LCS could involve more students in virtual learning, after which Sisk entered into a contract with Ed Op to recruit students statewide. Carter's role was to assist LCS staff members in organizing their branch of virtual education. And Corkren was paid $55 per month for each student, which was increased from the original price of $45 per month. Most of the $10 difference was then sent to Sisk through a charity.

State officials later showed up at LCS to check on the sudden increased enrollment and found enrollment forms signed by private school headmasters. These officials told Sisk that this was insufficient, as a parental signature was needed. Later, the officials met with Mr. Holladay and Carter and asked for the same enrollment forms for ACS virtual students. Mr. Holladay told the officials that the forms were not available and then told Corkren to get new forms with the parents' signatures. Corkren did so and sent them to Carter. Some students had out-of-state addresses, and Corkren changed their addresses to locations in Alabama. Corkren paid the private schools for the forms and then sent an invoice to Carter for the money.

On a later date, ACS decided to conduct an audit in response to further inquiries from ASDE, and Carter was put in charge. According to Corkren's testimony, Carter requested evidence to support the idea that the virtual students enrolled in ARS were truly enrolled in the program. Carter knew, according to Corkren, that the students were not actually taking full course loads and told Corkren that the reports needed to show that they were completing the work for four full classes. Corkren testified that he fabricated grades and coursework in creating the fake reports and that Carter was aware the reports were fake. At one point, Carter told Corkren that the reports needed to be more detailed and that he wanted more course work indicated.

These reports were eventually sent to ASDE, but its investigation did not stop, and eventually federal investigators became

involved. The co-conspirators—other than Sisk, who withdrew from the scheme after state officials visited LCS—decided to end the scheme in the middle of 2018.

Throughout the underlying proceedings, Carter requested that the district court instruct the jury on the unanimity requirement for the conspiracy charge. Before trial began, Carter submitted proposed jury instructions to the district court. In his proposed instructions, he included an instruction addressing the unanimity requirement. His proposal stated, "Rick Carter is charged in Count One of the indictment with conspiring to commit wire fraud. You must unanimously agree that Rick Carter formed a particular agreement with a particular person to pursue at least one particular criminal object of the alleged conspiracy." It then defined unanimity:

> Each juror must agree with each of the other jurors that Rick Carter reached the same agreement with the same person to pursue the same criminal object of the charged conspiracy. The jury need not unanimously agree on all agreements, all persons in, or all criminal objects of a charged conspiracy. But, in order to convict Rick Carter of the conspiracy charged in Count One, you must unanimously agree that Rick Carter knowingly and willfully entered into the same agreement with the same person . . . with the specific intent to advance or further at least one particular criminal object of the alleged conspiracy. Unless the government has proven that Rick Carter knowingly and willfully entered into the same agreement with

the same person . . . with the specific intent to advance or further the same criminal object of the alleged conspiracy to each of you, beyond a reasonable doubt, you must find Rick Carter not guilty of the offense alleged in Count One of the Indictment.

At the jury instruction hearing, Carter's attorney argued for the inclusion of the jury unanimity instruction, stating that "[w]e have multiple conspiracies in this case, and it's important that the jury understand that if they find Dr. Carter guilty, that there is unanimity as to their findings in terms of conspiracy." The government argued that the district court's proposed instruction already adequately stated the law. The district court then read the instruction it intended to use:

> Proof of several separate conspiracies isn't proof of the single overall conspiracy charged in the indictment unless one of the several conspiracies proved is a single overall conspiracy charged in the indictment. You must decide whether the single overall conspiracy charged in the indictment existed between two or more conspirators. If not, then you must find the defendant not guilty.

Carter's attorney stated that he did not agree with that instruction because it made it sound as if the jury could find "that Mr. Corkren and Mr. Holladay were in a conspiracy, and [Carter] would be found guilty of that."

The district court initially rejected this argument but then stated, "You're right. I don't include the defendant there." The district court then stated:

> I would go on to say, but if you decide that a single overall conspiracy charged in the indictment did exist, then you must decide who the conspirators were. And if you decide that a particular defendant was a member of some other conspiracy not charged, then you must find the defendant not guilty. To find a defendant guilty, you must all agree that the defendant was a member of the conspiracy charged.

Carter's attorney said that the instruction "sounds familiar, like the conspiracy to commit wire fraud pattern." And Carter's attorney said he "[thought] that's appropriate, what [the district court] just said. That goes right to this specific intent, unanimity." The government did not object to this proposed instruction, and the district court said that it would "give something like that, then."

Regarding the unanimity issue, the district court ultimately instructed:

> Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies proved is the single overall conspiracy charged in the indictment.

> You must decide whether the single overall conspiracy charged existed between two or more conspirators and included the defendant. If not, then you must find the defendant not guilty of that charge.

> But if you decide that a single overall conspiracy charged in the indictment did exist, then you must decide who the conspirators were. And if you decide

that the defendant was a member of some other con-
spiracy—not the one charged—then you must find
the defendant not guilty.  So to find the defendant
guilty, you must all agree that the defendant was a
member of the conspiracy charged—not a member
of some other separate conspiracy.

With respect to conspiracy to commit wire fraud, the dis-
trict court, among other things, instructed:

When considering whether the government has
proven that the defendant conspired to commit wire
fraud, you must decide whether: (1) there is proof be-
yond a reasonable doubt that the defendant willfully
entered into an agreement to execute a scheme to de-
fraud; and (2) there is proof beyond a reasonable
doubt that wire communications in interstate com-
merce were transmitted to help carry out the scheme
to defraud.

And regarding the charges of aggravated identity theft, the
district court instructed:

The government also must prove that the means of
identifications [sic] was possessed "during and in rela-
tion to" the crime alleged in the indictment.  The
phrase "during and in relation to" means that there
must be a firm connection between the defendant,
the means of identification, and the crime alleged in
the indictment.  The means of identification must
have helped him with some important function or
purpose of the crime, and not simply have been there
accidently or coincidentally.    The means of

identification at least must facilitate or have the potential of facilitating, the crime alleged in the indictment.

The jury found Carter guilty as to one count of conspiracy to defraud the United States, four counts of wire fraud, and two counts of aggravated identity theft, and either found Carter not guilty, or failed to reach a verdict, as to the remaining counts. The government moved to dismiss the counts with respect to which the jury failed to reach a verdict, which the district court granted.

The district court sentenced Carter to 66 months' imprisonment. The sentence consisted of 42 months' imprisonment for each conspiracy and wire fraud count to be served concurrently with each other, and 24 months' imprisonment for each aggravated identity count to be served concurrently with each other and consecutively to the terms for the other counts. The district court also sentenced Carter to a term of three years' supervised release, consisting of three years for the conspiracy and wire fraud counts and one year for the aggravated identity theft counts, all to run concurrently with each other.

This timely appeal follows.

## II.

We review a defendant's claim of a material variance "through viewing the evidence in the light most favorable to the government to determine whether a reasonable trier of fact could have found that a single conspiracy existed beyond a reasonable doubt." *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996).

"We will uphold the conviction unless the variance (1) was material and (2) substantially prejudiced the defendant." *Id.* We review an alleged constructive amendment *de novo*. *United States v. Feldman*, 931 F.3d 1245, 1253 (11th Cir. 2019). And we review a district court's jury instructions for abuse of discretion. *United States v. Dean*, 487 F.3d 840, 847 (11th Cir. 2007).

However, if a defendant asserts an argument for the first time on appeal, we review for plain error. *United States v. Patterson*, 595 F.3d 1324, 1326 (11th Cir. 2010). To prove plain error, a defendant must show that there is "(1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* To show that an error affected a defendant's substantial rights, "the defendant generally must show a 'reasonable probability' that the error affected the outcome of the district court proceedings, 'which means a probability sufficient to undermine confidence in the outcome.'" *United States v. Iriele*, 977 F.3d 1155, 1177 (11th Cir. 2020) (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005)).

### III.

On appeal, Carter argues that: (1) the government materially varied the indictment by eliciting testimony from Sisk about Carter's involvement with the Limestone County Virtual School, even though the indictment did not charge that Carter was involved in the Limestone County scheme; (2) the district court constructively amended the indictment by instructing the jury as it did

14                    Opinion of the Court                    22-12744

on the conspiracy charge; and (3) the district court plainly erred in instructing the jury on aggravated identity theft. We take these arguments in turn and conclude that none provide cause for reversal.

**A.**

We first address Carter's material variance argument.[3] Carter must demonstrate both that there was a material variance and that this variance substantially prejudiced him. *See Castro*, 89 F.3d at 1450. He has not made the first showing, and we thus need not determine whether he has made the second.

"A material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." *Id.* We determine if there was a material variance by asking "whether the evidence supports the jury's conclusion that a single conspiracy existed." *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008). "A material variance will only result if there is no evidentiary

_____

[3] While Carter includes his variance argument as part of his constructive amendment argument in his brief, we address his variance argument separately. *See Feldman*, 931 F.3d at 1260 ("Constructive amendments should be distinguished from 'material variances' between the allegations in the indictment and the proof at trial, which are not reversible *per se*."); *see also United States v. Keller*, 916 F.2d 628, 633–34 (11th Cir. 1990) (explaining the distinctions between an amendment and a variance). We also note that it is unclear whether Carter raised this exact variance argument below. But the government does not argue that it is not preserved, and even assuming it is preserved, Carter's arguments are without merit.

foundation for the jury's finding of a single conspiracy." *Id.* To prove substantial prejudice, a defendant must show:

> 1) that the proof at trial differed so greatly from the charges that appellant was unfairly surprised and was unable to prepare an adequate defense; or 2) that there are so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another.

*United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997).

Here, Carter argues that, through Sisk's testimony, the government introduced evidence that Carter was involved in the Limestone County conspiracy, even though he was not charged in the indictment with participation in that conspiracy. As a result, he argues that he may have been convicted with respect to a conspiracy that was not charged in the indictment. But Carter does not dispute that there is an "evidentiary foundation for the jury's finding of a single conspiracy." *See Richardson*, 532 F.3d at 1284. Indeed, in his brief, he concedes that a rational juror could have found that "all of the fraudulent activity revealed by the evidence adduced at trial was part of the one unitary scheme . . . alleged in the indictment." Carter then recognizes that a "reasonable juror could have found a broader scheme, centered on fraudulent activity conducted by and through [Mr.] Holladay and Corkren, that encompassed the Limestone County Schools and Athens City Schools, both as means of increasing the profits of [Mr.] Holladay and

Corkren." These concessions are fatal to Carter's arguments, and we therefore affirm as to this issue.

## B.

We next consider Carter's constructive amendment argument. The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. "This clause does not 'permit a defendant to be tried on charges that are not made in the indictment against him' or convicted on theories that the indictment 'cannot fairly be read as charging.'" *Feldman*, 931 F.3d at 1259–60 (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). "The 'constructive amendment' of an indictment 'occurs when the essential elements of the offense contained in the indictment are altered'—for instance, by a faulty jury instruction—'to broaden the possible bases for conviction beyond what is contained in the indictment.'" *Id.* at 1260 (quoting *United States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013)). Such an error "is *per se* reversible because it violates the defendant's constitutional right to be tried solely on the charges returned by the grand jury." *United States v. Johnson*, 713 F.2d 633, 643 (11th Cir. 1983). However, a defendant "cannot obtain reversal [for constructive amendment] based on a jury instruction that he affirmatively accepted." *See Feldman*, 931 F.3d at 1260.

Here, Carter affirmatively accepted the district court's unanimity jury instruction. Thus, he cannot obtain reversal. After the district court responded to Carter's concerns regarding unanimity

by reading its proposed instruction, Carter's attorney said that he "[thought] that's appropriate" and that the instruction "goes right to this specific intent, unanimity." The district court then gave a materially identical instruction to the jury. Consequently, the doctrine of invited error applies. *See, e.g., United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005) ("When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." (quoting *Ford ex rel. Est. of Ford v. Garcia*, 289 F.3d 1283, 1294 (11th Cir. 2002))). And Carter cannot now "cry foul on appeal," given his counsel's statements to the district court. *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009).

But even if Carter's attorney had not affirmatively accepted the instruction, Carter's argument would still fall short. The district court clearly instructed the jury that it was required to unanimously find that Carter committed the single charged conspiracy in order to find him guilty of Count One, and that if it decided he was a member of an uncharged conspiracy, it must find him not guilty. This instruction did not "broaden the possible bases for conviction beyond what is contained in the indictment." *See United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990).

Finally, while Carter also argues that the district court's later instruction about conspiracy to commit wire fraud contributed to the issue by failing to instruct the jurors that "that they had to agree unanimously on the existence of the same single scheme to

defraud," Carter did not object to his instruction below.[4]  And he fails to make an argument on appeal that this instruction constitutes plain error.  *See United States v. Beach*, 80 F.4th 1245, 1254 (11th Cir. 2023) ("If an appellant does not preserve an issue on appeal, we review for plain error.").  In any case, this instruction does not constitute plain error, or even error for that matter, when considered together with the unanimity instruction that Carter's attorney assented to.  *See Watson v. Alabama*, 841 F.2d 1074, 1076 (11th Cir. 1988) ("Courts may not evaluate a single jury instruction in isolation, but must view it in light of the overall charge.").  For these reasons, Carter is not entitled to relief on this issue, and we reject his arguments.

## C.

Finally, we consider Carter's challenge to the district court's jury instructions for aggravated identity theft.  Both parties agree that we review only for plain error, as Carter's argument is attributable to a change in the law and he raises it for the first time on appeal.  *See United States v. Gladden*, 78 F.4th 1232, 1245 (11th Cir. 2023) ("The plain-error standard applies even if, as is the case here, there were no legal grounds for challenging the instructions at the time they were given, but such legal grounds have since arisen due to a

---

[4] As recounted above, the district court instructed the jury that it must decide "whether: (1) there is proof beyond a reasonable doubt that the defendant willfully entered into an agreement to execute a scheme to defraud; and (2) there is proof beyond a reasonable doubt that wire communications in interstate commerce were transmitted to help carry out the scheme to defraud" when considering whether Carter conspired to commit wire fraud.

new rule of law arising between the time of conviction and the time of appeal." (quoting *United States v. Pelisamen*, 641 F.3d 399, 404 (9th Cir. 2011))).

The criminal statute for aggravated identity theft states, "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1). Subsection (c) enumerates, among other provisions, "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)." *Id.* § 1028A(c)(5).

In *Dubin v. United States*, 599 U.S. 110 (2023), the Supreme Court was tasked with remedying a circuit split as to what it means to "use . . . a means of identification" in relation to a predicate offense under § 1028A(a)(1). *Id.* at 116–18. The defendant was convicted for aggravated identity theft based on a predicate offense of healthcare fraud. *Id.* at 113–15. The defendant, who "submitted a claim for reimbursement to Medicaid for psychological testing by a licensed psychologist," overstated the qualifications of the employee who performed the testing, which inflated the amount of reimbursement. *Id.* at 114. At trial, the government argued that § 1028A(a)(1) was satisfied because the fraudulent billing included a patient's Medicaid reimbursement number. *Id.* at 115. The Court disagreed and held that a "defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is

at the crux of what makes the conduct criminal." *Id*. at 131. "[B]eing at the crux of the criminality," the Court explained, "requires more than a causal relationship, such as 'facilitation' of the offense or being a but-for cause of its 'success.'" *Id*. Instead, "the means of identification specifically must be used in a manner that is fraudulent or deceptive." *Id* at 131–32.

With respect to the conduct at issue in *Dubin*, the Court reasoned that the defendant's "use of the patient's name was not at the crux of what made the underlying overbilling fraudulent." *Id*. "The crux of the healthcare fraud was a misrepresentation about the qualifications of [the defendant's] employee," and so, "[t]he patient's name was an ancillary feature of the billing method employed." *Id*. In all, the Court explained that the "fraud was in misrepresenting *how* and *when* services were provided to a patient, not *who* received the services," and for that reason, the defendant's conduct did not provide a basis for prosecution under § 1028A(a)(1). *Id*. (emphasis in original).

We applied this interpretation of § 1028A(a)(1) in *United States v. Gladden*, 78 F.4th 1232 (11th Cir. 2023). There, we considered the challenges of two defendants, Linton and Gladden, to their convictions for conspiracy to commit health care fraud as well as, among other substantive offenses, aggravated identity theft. *Id*. at 1238. The defendants were employees of a pharmaceutical company involved in filling prescriptions that billed "pharmacy benefit managers (PBMs)" and received reimbursements from the PBMs and insurance companies for those prescriptions. *Id*. The

defendants played a part in a company-wide scheme "to defraud pharmacy networks by secretly billing PBMs for medically unnecessary and fraudulent prescriptions." *Id.*

We affirmed Linton's convictions for aggravated identity theft on plain-error review under *Dubin*. *Id.* at 1244–46. We reasoned that, even if Linton could meet the first two requirements of the plain error test, she could not establish that there was a reasonable probability that the error affected the outcome of the trial, for her "conduct f[ell] within the [aggravated identity theft] statute's purview. *Id.* at 1245. This was because she changed the addresses on file for certain customers to those of another so that her company could continue billing for prescriptions. *Id.* In other words, Linton used these customers' identities "to continue refilling prescriptions in their names, even though they were neither aware of nor received any products." *Id.* We concluded that this forgery of the customers' identities was "at the heart of the deception" because it "directly enabled [the company] to continue billing for medically unnecessary prescriptions." *Id.* We also explained how Linton altered a prescription to include medically unnecessary drugs without the prescribing doctor's knowledge, which directly enabled her to bill for them. *Id.* at 1245–46. We thus concluded that Linton's conduct fell "squarely within the classic variety of identity theft left untouched by *Dubin*," as she "did not provide a service to a client while merely misrepresenting how the service was performed to inflate the bill," but rather "used the means of identification of former patients and prescribing doctors to overbill for certain products." *Id.* at 1246.

As for Gladden, we vacated his aggravated identity theft conviction. *Id.* at 1248–49. We concluded that the jury instruction adopted the "broad reading of Section 1028A" that *Dubin* rejected and that this error "'affected the outcome of the district court proceedings' as to Gladden." *Id.* at 1248 (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)). This was because Gladden's misrepresentations to PBMs and insurance companies "involved only whether the prescriptions were medically necessary." *Id.* at 1248–49. Gladden, at no point, misrepresented "who received the prescriptions." *Id.* at 1248.

We find that Carter's case is more like Linton's than Gladden's. There is no disagreement that the district court's jury instructions meet the first two requirements of our plain error test, for they are obviously erroneous under *Dubin*. The district court instructed the jury that it could convict Carter for aggravated identity theft if it found, among other things, that the means of identification in the case facilitated his fraud, not if it found, as *Dubin* requires, that the use of the identity was at the crux of the predicate wire fraud offense. *See* 599 U.S. at 131.

But Carter's argument fails at the third step of the plain error test. He cannot show that the jury instructions "affected his substantial rights," *Puckett v. United States*, 556 U.S. 129, 133 (2009), i.e., that there is "a reasonable probability that the error affected the outcome of the trial," *Marcus*, 560 U.S. at 262. In this case, Carter used the students' information to make it appear that they were enrolled at ARS, which had the effect of increasing state funding

for ACS. And he oversaw the creation of fraudulent enrollment forms and report cards to carry out this scheme. Given this evidence, Carter's fraud was in misrepresenting "who received the services," and his use of the victim's names and information was "at the crux of what made" the entire scheme fraudulent. *See Dubin*, 599 U.S. at 132 (emphasis removed). Therefore, this conduct is more like Linton's than Gladden's, for Carter's use of students' identities "directly enabled [ACS] to continue" receiving funding from ASDE. *See Gladden*, 78 F.4th at 1245. Indeed, "unlike in *Dubin*, [Carter] did not provide a service to a client while merely misrepresenting how the service was performed to inflate the bill." *See id.* at 1246. Instead, he misused the identities of students to receive more funding from ASDE. Carter's forgery of the students' identities is thus "at the heart of the deception" and his conduct "falls squarely within the classic variety of identity theft left untouched by *Dubin*." *Id.* at 1245–46.

Accordingly, even under *Dubin's* interpretation of § 1028A(a)(1), the outcome of Carter's trial would have been the same, and he is not entitled to vacatur of his aggravated identity theft convictions.

## IV.

For these reasons, we affirm Carter's convictions.

**AFFIRMED.**